UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADRIAN MARCU, Individually and on Behalf of All Others Similarly Situated,<br><br>                         Plaintiff,<br><br>    v.<br><br>CHEETAH MOBILE INC., SHENG FU, KA WAI ANDY YEUNG, YUK KEUNG NG, and VINCENT ZHENYU JIANG,<br><br>                    Defendants. | Case No. 18-CV-11184 (JMF)<br><br>SECOND AMENDED CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Xuefeng Zhang, Plaintiff Adrian Marcu, and Plaintiff Gregory Timourian (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cheetah Mobile Inc. ("Cheetah" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired Cheetah securities between April 21, 2015 and November 27, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Cheetah is a publicly traded Chinese app developer that's one of the biggest publishers in the Google Play store, Google's official store and portal for Android apps, games and other content for Android-powered phone, tablet or Android TV devices.   Cheetah has attracted hundreds of millions of monthly active users through its mobile utility products such as Clean Master and Cheetah Keyboard, casual games such as Piano Tiles 2, Bricks n Balls, and the live streaming product LiveMe. Cheetah's apps have been downloaded over 2 billion times since they were launched beginning in September 2011. For example, Cheetah's app Clean Master was launched in September 2012 and has since been downloaded 1 billion times. Several of the Company's apps are among the most popular productivity apps in the entire Google Play store.

3.     As the Company states in its filings with the SEC, "substantially all of our mobile and PC applications are free to our users."   It therefore relies on "monetization opportunities" --- predominantly "from 'its' utility products and related services primarily by providing advertising services to advertisers worldwide, and also by selling advertisements and referring user traffic on our mobile and PC platforms" --- to generate revenue.  Included in its list of "utility products" are "core mobile and PC offerings" available in the Google Play Store

such as Clean Master, Security Master, Battery Doctor, CM Locker, and Cheetah Keyboard among others.

4.      Throughout the Class Period, seven Cheetah Mobile apps with more than 1.5 billion total downloads were using an ad fraud technique called click injection to claim credit and a share of revenue for the installation of other apps. Specifically, the seven Cheetah Mobile apps at issue ("utility products" called Clean Master, CM File Manager, CM Launcher 3D, Security Master, Battery Doctor, CM Locker, and Cheetah Keyboard) contained software that enabled them to falsely receive credit for helping cause a user to download and open other apps. App developers pay a fee to partners that help drive new downloads of their apps. These seven Cheetah apps claimed a portion of these fees even when they played no role in an installation. Google Play Store's policies prohibit such activities, which it refers to as "install attribution abuse."

5.      Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Cheetah's apps had undisclosed imbedded features which tracked when users downloaded new apps; (ii) Cheetah used this data to inappropriately claim credit for having caused the downloads; (iii) the foregoing features, when discovered, would foreseeably subject the Company's apps to removal from the Google Play store; (iv) accordingly, Cheetah's Class Period revenues were in part the product of improper conduct and thus unsustainable; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.      On November 26, 2018, *BuzzFeed News* reported that these seven Cheetah apps then available in the Google Play store were exploiting user permissions as part of an ad fraud

scheme. The *BuzzFeed News* article, citing the results of testing done by Kochava, a mobile app analytics company that also acts as a "referee" in the mobile app advertising industry, stated that Cheetah's apps "tracked when users downloaded new apps and used this data to inappropriately claim credit for having caused the download." *BuzzFeed News* reported that two of Cheetah's apps were removed from the Google Play store after publication of the article.

7.     On this news, Cheetah's American depositary receipt ("ADR") price fell $3.32, or nearly 37%, over the next two trading sessions, closing at $5.48 on November 27, 2018.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Cheetah securities are traded on the New York Stock Exchange ("NYSE"), located within this Judicial District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiffs, as set forth in the previously filed certifications of Xuefeng Zhang and Adrian Marcu and in attached certification of Gregory Timourian, acquired Cheetah securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Cheetah is a Chinese corporation with its principal executive offices located at Building No. 8, Hui Tong Times Square Yaojiayuan South Road, Beijing 100123, China. Cheetah's ADRs trade in an efficient market on NYSE under the ticker symbol "CMCM."  The Company was formerly known as Kingsoft Internet Software Holdings Limited and changed its name to Cheetah Mobile Inc. in March 2014. Cheetah was incorporated in 2009 and is headquartered in Beijing, People's Republic of China.   Throughout the Class Period, Kingsoft Corporation Limited ("Kingsoft Corporation"), a company listed on the Hong Kong Stock Exchange, held a controlling interest in Cheetah.

15.     Defendant Sheng Fu ("Fu") has served as Chief Executive Officer and Director of Cheetah since November 2010.  Defendant Fu has also served as the Senior Vice President at Kingsoft Corporation since March 2011. According to the Cheetah's Registration Statement, filed on April 2, 2014, Cheetah's founders, Defendant Fu and Mr. Ming Xu, jointly owned Kingsoft Corporation.

16.     Defendant Ka Wai Andy Yeung ("Yeung") served as the Chief Financial Officer from January 2014 until his resignation in March 2017.

17.     Defendant Yuk Keung Ng ("Ng") has been a director at Cheetah since July 2012.  Defendant Ng also sat on the Company's Audit Committee during the Class Period, which, according to the Company's SEC filings, "oversees our accounting and financial

reporting processes and the audits of the financial statements of our company." Kingsoft Corporation appointed Defendant Ng as the interim Principal Financial Officer of Cheetah from April 1, 2017 to April 10, 2017. Defendant Ng became Chief Financial Officer of Kingsoft Corporation in 2012 and executive director of Kingsoft Corporation on March 1, 2013.

18.     Defendant Vincent Zhenyu Jiang ("Jiang") has served as the Principal Financial Officer of Cheetah since April 10, 2017.

19.     The Defendants referenced above in ¶¶ 14-18 are sometimes referred to herein collectively as the "Individual Defendants."

20.     The Company's annual report on Form 20-F for the period ended December 31, 2014 (the "2014 20-F"), filed on April 21, 2015, stated that:

> As of March 31, 2015, Kingsoft Corporation, our controlling shareholder, and Messrs. Sheng Fu and Ming Xu, directly or through their holding vehicles, together beneficially own an aggregate of 793,045,774 of our Class B ordinary shares and 47,540,877 of our Class A ordinary shares, including Class A ordinary shares underlying the ADSs, or 59.0% of our total outstanding shares, and 70.9% of the total voting power.

> \*\*\*

> Kingsoft Corporation, our controlling shareholder, and our founders Mr. Sheng Fu and Mr. Ming Xu, directly or through their holding vehicles, beneficially own an aggregate of 59.0% of our total outstanding shares, representing 70.9% of our total voting power as of March 31, 2015.

21.     The Company's annual report on Form 20-F for the period ended December 31, 2015 (the "2015 20-F"), filed on March 17, 2016, stated that:

> As of March 31, 2016, Kingsoft Corporation, our controlling shareholder, and Messrs. Sheng Fu and Ming Xu, directly or through their holding vehicles, together beneficially own an aggregate of 58.8% of our total outstanding Class A and Class B shares, and 72.6% of the total voting power. This concentration of ownership may discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of any contemplated sale of our company and may reduce the price of our ADSs.

***

> Kingsoft Corporation, our controlling shareholder, and our founders Mr. Sheng Fu and Mr. Ming Xu, directly or through their holding vehicles, beneficially own an aggregate of 58.8% of our total outstanding shares, representing 72.6% of our total voting power as of March 31, 2016, **which give them considerable influence…**"

22.     The Company's annual report on Form 20-F for the period ended December 31, 2016 (the "2016 20-F"), filed on April 26, 2017, stated that:

> As of March 31, 2017, Kingsoft Corporation, our controlling shareholder, and Messrs. Sheng Fu and Ming Xu, directly or through their holding vehicles, together beneficially own an aggregate of 57.1% of our total outstanding Class A and Class B shares, and 72.7% of the total voting power. This concentration of ownership may discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of any contemplated sale of our company and may reduce the price of our ADSs.

***

> Kingsoft Corporation, our controlling shareholder, and our founders Mr. Sheng Fu and Mr. Ming Xu, directly or through their holding vehicles, beneficially own an aggregate of 57.1% of our total outstanding shares, representing 72.7% of our total voting power as of March 31, 2017, **which give them considerable influence**…

23.     The 2016 20-F further stated that, "On February 12, 2017, Kingsoft Corporation entered into a voting proxy agreement with Mr. Sheng Fu, our chief executive officer and director, pursuant to which Kingsoft Corporation agreed to delegate voting rights pertaining to up to 399,445,025 Class B ordinary shares of our company that it owns to Mr. Fu."

24.     The Company's annual report on Form 20-F for the period ended December 31, 2017 (the "2017 20-F"), filed April 24, 2018, stated that:

> On February 12, 2017, Kingsoft Corporation have entered into a voting proxy agreement with Mr. Sheng Fu, which became effective on October 1, 2017. According to such agreement, Kingsoft Corporation have delegated to Mr. Sheng Fu its approximately 38% voting power of our company. Mr. Sheng Fu has approximately 44% voting power of our company so far…

25.     The 2017 20-F made clear that, "we and our overseas subsidiaries may be considered as companies **under control of Mr. Sheng Fu**."  The 2017 20-F further stated:

> As of March 31, 2018, Kingsoft Corporation, one of our principal shareholders, and Messrs. Sheng Fu and Ming Xu, directly or through their holding vehicles, together beneficially own an aggregate of 57.8% of our total outstanding Class A and Class B shares, and 74.4% of the total voting power. This concentration of ownership may discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of any contemplated sale of our company and may reduce the price of our ADSs.
>
> *** 
>
> Kingsoft Corporation, one of our principal shareholders, and our founders Mr. Sheng Fu and Mr. MingXu, directly or through their holding vehicles, beneficially own an aggregate of 57.8% of our total outstanding shares, representing 74.4% of our total voting power as of March 31, 2018, **which give them considerable influence**…

26.     Each 20-F the Company filed during the Class Period made clear that, "***Our controlling shareholder and founders have substantial influence over our company...***" The controlling shareholder is Kingsoft Corporation and one of Cheetah's two founders is Defendant Fu.

27.     Each 20-F the Company filed during the Class Period also made clear that, "Our future success depends substantially on the continued efforts of our management team and key employees, in particular, Mr. Sheng Fu, our chief executive officer…The loss of Mr. Fu… could harm our business."

28.     Moreover, each 20-F the Company filed during the Class Period explained that, "Because of PRC restrictions on foreign ownership of internet businesses in China, we depend on contractual arrangements with our [Variable Interest Entities ("VIEs")], in which we have no ownership interest, to conduct our business in China. These contractual arrangements are intended to provide us with effective control over these entities and allow us to obtain

economic benefits from them. Our VIEs are owned directly by Messrs. Sheng Fu, Ming Xu and Wei Liu, who are also our core management and/or director…"

29.    In their positions at Cheetah and/or Kingsoft Corporation, the Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

30.    Cheetah is a mobile Internet company with global market coverage. It has attracted hundreds of millions of monthly active users through its core offerings which include mobile utility products, such as Clean Master, CM Launcher, Security Master and Cheetah Keyboard.  Cheetah provides its advertising customers, which include direct advertisers and mobile advertising networks through which advertisers place their advertisements, with direct access to highly targeted mobile users and global promotional channels.

31.    Cheetah's mobile apps are available for download through, *inter alia*, Google Play, a digital distribution service operated and developed by Google Inc. ("Google"). Google

Play serves as the official app store for Google's Android operating system, allowing users to browse and download applications developed with the Android software development kit ("SDK") and published through Google.  App developers with apps available in the Google Play Store must adhere to Google's policies, available at https://play.google.com/about/developer-content-policy/#!?modal_active=none.  Failure to adhere to Google Play's policies can result in removal of the app from the Google Play store.

32.     Per the Company's latest 20-F, "Google became [Cheetah's] largest customer in 2017, and contributed 15.2% of [its] total revenues…"  The Company made clear that it expects Google to "contribute a significant portion of our revenues in the near future" and admitted that loss of or substantial reduction in revenues from Google would "materially and adversely" affect Cheetah's "business, financial condition and results of operations."

33.     Per the Company's SEC filings, a primary way in which it generates revenue is through fee arrangements it has pursuant to which if a user clicks to install a new app from one of Cheetah's apps, Cheetah collects a fee as credit for causing the download.  According to eMarketer, app installs are a more than $7 billion global market.

**Cheetah's Ad Fraud Using Click Injection**

34.     However, unbeknownst to Cheetah's app users, its advertising customers, and Cheetah investors, Cheetah engaged in ad fraud through seven of its utility apps using a technique called "click injection" (sometimes referred to as "install hijacking").  Click injection is a type of mobile fraud where an app is notified when a new app is being installed and sends a series of clicks to attribution networks before the install is complete. The fraudster gets credit for what is most likely an organic install – and gets paid for it.

35.     The Cheetah apps that utilized click injection are Clean Master, CM File Manager, CM Launcher 3D, Security Master (formerly known as "CM Security"), Battery Doctor, CM Locker, and Cheetah Keyboard. Several are among the most popular productivity apps in the entire Google Play store. For example, from October 27, 2018 until November 26, 2018, these apps were downloaded more than 20 million times, according to data from the AppBrain analytics service. CM Launcher 3D is also promoted to users as one of Google Play's "go-to apps."

36.     These seven Cheetah apps require users to give them permission to see when new apps are downloaded, and to be able to launch other apps. The Cheetah apps listen for when a user downloads a new app. As soon as a new download is detected, the Cheetah app looks for active install bounties available for the app in question. It then sends off clicks that contain the relevant app attribution information to ensure Cheetah wins the bounty — even though it had nothing to do with the app being downloaded. Because Cheetah's apps are also programmed to launch the newly downloaded app without the user's knowledge, this helps increase the odds that it will receive credit for the app install, as the bounty is only paid when a user opens a new app.

37.     The Cheetah apps engaging in click injection are loaded with proprietary software to facilitate and conceal app attribution. This enables them to pass the attribution through many ad networks to hide the fact that so many attribution wins are coming from these apps.

38.     These seven apps are a key component of Cheetah's earnings from "utility products and related services."  Utility products have generated as much as half of the Company's total revenue.

**Kochava**

39.      Kochava is a mobile app analytics company that also acts as a "referee" in the mobile app advertising industry.   The company has developed tools to identify fraudulent activity, such as an ad company falsely taking credit for app downloads.   Companies like Cheetah hire Kochava to provide them with data and analytics about their apps.

40.      Grant Simmons is Head of Client Analytics for Kochava, and held that position at the time Kochava uncovered that seven of Cheetah's most popular utility product apps engaged in click injection fraud.   As Simmons told Plaintiffs, the mobile app industry pays billions of dollars each year to advertisers to lure users to download new apps. For example, when a phone user is on Google and clicks on an ad for an app, downloads that app and then opens it, Google receives payment (credit) from that app developer for the successful advertising.   Kochava acts as a referee to determine which ad network (such as Google, Facebook or Cheetah) should receive attribution (credit) when a user downloads and opens an app.

41.      Kochava counted Cheetah as one of its clients until it discovered that Cheetah apps were fraudulently giving the Company credit for app downloads when the user had not clicked on any ads via Cheetah's network.

42.      Simmons explained to Plaintiffs that Kochava ran tests showing Cheetah apps had software coding that injected fake clicks to make it appear a phone had clicked through an ad published by Cheetah when in fact the phone user had not clicked on any such ad.

43.      Simmons described the testing Kochava had done on the Cheetah apps as follows: Kochava wiped clean an android phone, reset it and downloaded a Cheetah app. They then opened the Cheetah app for a minute and then closed it.   Next, they went to Google Play

and downloaded an app (not going through any advertising), such as the Yahoo Mail app, and opened it.  Kochava then looked at the signals the phone was sending out and found it was communicating that the phone user had clicked through an ad on a Cheetah network to get to the Yahoo Mail app. Yet nothing like that was actually done on the phone.  Simmons explained that secretly within the phone, the software coding within the Cheetah app was injecting a fake click that did not actually occur to make it appear the phone had clicked through an ad that it had not actually clicked through. Simmons described this is "textbook click injecting."

44.    Simmons said Kochava video recorded what was actually done on the phone – going to Google Play, searching for an app, downloading that app, etc. – and then compared it to the digital signaling that the phone communicated at the same time.  The comparisons clearly showed that the phone was communicating clicks through Cheetah ad networks that were not actually clicked on the phone.

45.    Simmons stated that Kochava traced the nefarious activity to coding within the Cheetah apps which was written with a Software Development Kit (SDK) called adkmob. According to Simmons, and as confirmed by the supporting documents you can download on how to use adkmob, Cheetah authored the adkmob SDK.

**Confidential Witnesses**

46.    Confidential Witness ("CW") 1 was a Senior Staff Engineer working on the company's Cloud Platform from April 2016 to May 2017. CW1 was based at the company's Palo Alto, CA, office, and reported to Bo Tao, VP of Engineering. Tao reported to Charles Fan, Chief Technology Officer.  CW1 confirmed that several Cheetah apps are designed to data mine.  For example, CW1 explained that Cheetah's Clean Master app is billed as a "junk file cleaning, memory boosting and privacy protection tool," but in cleaning, the app also has access

to everything else on the phone. When the app is downloaded and opened, it asks for the user's permission to access all of the user's data on the phone. When the user clicks yes and uses the app, the program now has access to anything and everything on the phone even when the app is not in use.

47.     CW2 was a Public Relations Manager at Cheetah Mobile from March 2016 to October 2017. CW2 was based at the company's Palo Alto, CA, office, and reported to Josh Ong, Director of Communication and Marketing.  CW2 stated that the Company was foremost focused on metrics and "clicks" above all else.  CW2 explained that Cheetah, "was very much numbers based rather than qualitative." CW3 also said that the culture at Cheetah was all about clicks and revenue. According to CW3, the company was not concerned about quality or integrity.  CW3 was Director of Partnerships and Commerce for the Cheetah app Live.me from May 2016 to April 2018 reporting first to Mick Tsai, U.S. Head of Operations, and then to Khudor Annous, Head of Marketing and Partnerships for Live.me.  CW3 based the statements about the Company's lack of concern over integrity on misconduct CW3 observed including: a) Cheetah's use of pictures of social media influencers in advertisements for Live.me without getting permission or compensating them for the use of their image even after alerted by its U.S. based employees that it could not do so; and b) the laundering of money through Cheetah's Live.me app, including, for example, two alleged drug dealers from Chicago who funneled massive amounts of money through the site.  The Department of Justice and U.S. Postal Inspection Service even contacted CW3 regarding the suspicious transactions.   CW3 documented everything CW3 observed regarding illegal activity.   Though the matter was escalated up the chain of command, Cheetah did not stop the illegal activity because the users funneling large amounts of money provided the largest percentage of the app's revenue stream.

**Materially False and Misleading Statements Issued During the Class Period**

48.     The Class Period begins on April 21, 2015, when the Company filed its 2014 20-F, which contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Fu and Yeung, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

49.     The 2014-20-F is signed by Defendant Fu and lists Defendant Yeung as the Company's "contact person" on the cover page.  In the 2014 20-F, the Company reported total revenue of $284.2 million in 2014, approximately 75% of which it attributed to "online marketing services." The Company described its online marketing services business in the 2014 20-F, stating in relevant part:

> Revenues from our online marketing services accounted for 73.8%, 81.7% and 75.0% of our revenues in 2012, 2013 and 2014, respectively. ***We generate online marketing revenues primarily by referring user traffic and selling advertisements on our mobile and PC platforms.*** The fee arrangements generally include cost per sale, cost per click, cost per time or cost per installation for actions that originate from our platform. We believe that the most significant factors affecting revenues from online marketing include:
>
> - *User base and user engagement.* We believe a large, loyal and engaged user base would help us retain existing customers and attract more customers seeking online marketing services and at the same time gives us more pricing power. It also results in more user impressions, clicks, sales or other actions that generate more fees for performance-based marketing. In particular, a large and engaged mobile user base is crucial for the long-term growth of our online marketing services. We plan to increase our spending on marketing activities to further grow our global mobile user base.
>
> - *Revenue sharing and fee arrangements with our significant customers.* A small number of customers have contributed a majority of our online marketing service revenues. Changes in the revenue sharing or fee arrangements with these significant customers may materially affect our online marketing services revenues. For example, changes from pay per click to pay per sale arrangements may result in a smaller percentage of

revenue-generating traffic. Likewise, changes in the fee rate we receive per click or per sale may affect our online marketing services revenues. Although changes in the revenue sharing and fee arrangements with our individual customer may affect our revenues positively or negatively, our array of choices helps to increase our overall customer base and our ability to tailor fee arrangements to the needs of our customers.

- *Ability to increase the number of customers.* We had over 950 customers in 2014, including business partners such as Facebook and Google. Our ability to increase our number of customers depends on whether we can provide integrated marketing services and help the customers more precisely reach their targeted audience, the effectiveness of our direct sales efforts, our ability to successfully acquire additional customer base through acquisition of complementary businesses, and our ability to increase our range of cooperation with existing business partners such as Facebook and Google.

- *Optimal utilization of advertising inventory.* Certain categories of customers are willing to offer higher rates for our online marketing services due to the high return on investment they can achieve on our platform. Our ability to source high quality customers within the appropriate categories that our users are interested in and our ability to optimize the allocation of our advertising inventory to these customers can help improve our online marketing services revenues.

(Emphasis added.)

50.     Defendants' descriptions of the source of revenues Cheetah received from "referring user traffic" and related "fee arrangements" were false and misleading because several of its core apps were using an ad fraud technique called click injection to claim credit and a share of revenue for the installation of other apps. Specifically, Clean Master, CM File Manager, CM Launcher 3D, Security Master (formerly known as CM Security), Battery Doctor, CM Locker, and Cheetah Keyboard contained software that enabled them to falsely receive credit for helping cause a user to download and open other apps.  In other words, Cheetah collected fees from app developers for driving new downloads of their apps even though Cheetah in fact played no role in their installation.

51.    The Company acknowledged the importance of the Google Play store as a means of distribution for its apps, but presented merely a generic, boilerplate warning to the effect that "*[i]f* Google Play . . . terminate[s] their existing relationship with us, our business, financial condition and results of operations may be materially and adversely affected." (Emphasis added.)  This warning did nothing to alert investors to Cheetah's rampant ad fraud which had already placed its relationship with Google Play at risk and was therefore itself false and misleading.

52.    The 2014 20-F identifies what Cheetah considers its Core Applications. Included on that list are Clean Master, CM Security (later renamed Security Master), Battery Doctor, and CM Launcher.  The 2014 20-F describes these core apps as follows:

### Clean Master

Clean Master is a junk file cleaning, memory boosting and privacy protection tool we launched in September 2012 for mobile devices. Clean Master also features application management functions. Clean Master was the No. 1 application in the Tools category on Google Play by worldwide monthly downloads in December 2014, according to App Annie.

Clean Master utilizes our cloud-based application behavior library to identify junk files associated with the applications installed on users' end devices. Our data analytics engine can also identify junk files generated by unknown applications, which allow Clean Master to effectively clean these junk files.

As our cloud-based data analytics engines continue to evolve, Clean Master becomes more precise in identifying and cleaning junk files.

### CM Security

CM Security, which we launched in January 2014 on the Android platform, is an anti-virus and security application for mobile devices. It also features junk file cleanup and unwanted call blocking functions. CM Security was the No. 2 application in the Tools category on Google Play by worldwide monthly downloads in December 2014, according to App Annie.

Powered by the dual-mode local and cloud-based application behavior library and our security threats library, CM Security is able to efficiently identify junk files

and threats installed on users' mobile devices. Our data analytics engines also enable CM Security to identify threats not previously indexed in our application behavior and security threats libraries.

***Battery Doctor***

Battery Doctor is a power optimization tool for mobile devices we launched in July 2011. Battery Doctor optimizes battery usage by utilizing our cloud-based application behavior library that contains power consumption characteristics of a number of mobile applications. Our data analytics engine can also identify power consumption characteristics of unknown applications, which allows Battery Doctor to effectively manage the power settings for these applications.

***CM Launcher***

CM Launcher was launched in December 2014 on the Android platform, which is a secure launcher that offers acceleration, secure protection, stylish wallpapers, and it also automatically organizes mobile phones based on personal behavior. It is used to increase the startup speed of phones and boost their performance. Despite its light weight, CM Launcher enables apps to load quicker. Its anti-virus engine protects users' personal info and app data and block viruses and malware. CM Launcher automatically classifies users' apps into intelligent folders based on their habits, and recommends apps that are popular with the people in their neighborhood. In addition, it customizes users' unique wallpaper to fit their personal style.

53.    The descriptions of these apps were false and misleading because they did not explain that they each used "click injection" to claim credit for user installs of other apps, for which Cheetah then claimed fees from app developers though the Cheetah apps had played no role in the installation.

54.    On May 20, 2015 the Company filed a Form 6-K with its first quarter results of 2015 ("1Q 2015 6-K") signed by Defendant Yeung.  The 1Q 2015 6-K identifies its Clean Master, CM Security, and Battery Doctor as its "mission critical applications" and further states that its Clean Master app is, "the #1 mobile app in the Google Play Tools category worldwide by monthly downloads in March 2015, according to App Annie."  Defendants repeated these assertions in each quarterly filing throughout the Class Period.  However, Defendants did not

reveal that these apps had undisclosed embedded features which tracked when users downloaded new apps, that Cheetah used this data to inappropriately claim credit for having caused the downloads, and that this these fraudulent "click injection" activities could cause Google Play to remove Cheetah apps from the Google Play store.

55.     In a conference call discussing the 1Q 2015 6-K results, Defendant Fu emphasized that, "mobile revenue now account[s] for a majority of a total revenue for the first time in our history."  With regards to particular apps, Fu stated:

> In December 2014 we launched Personalization app called CM Launcher and according App Annie CM Launcher was among the top 20 non-game apps on Google Play and rated number two in the personalization application category on the Google Play in March 2015. CM Launcher rated at 4.6 out of 5 stars which was highly among the large mobile launcher we've had.

> In addition, we are creating a powerful of metrics of utility apps. In March, five of our apps were among the top-30 non-game apps on Google Play with continued success of Clean Master and CM Security as a base. We are able to effectively cross sell those app with high frequency of use, such as CM Launcher, CM Browser and CM Locker.

56.     These statements were false and misleading for the reasons stated in ¶¶ 50 and 53.

57.     In a press release dated August 18, 2015 attached to a Form 6-K signed by Defendant Yeung filed with the SEC setting forth the Company's second quarter results for 2015, Cheetah stated that, "Our mobile and global monetization capabilities have benefited from our strong partnerships with key global Internet giants like…Google."  Defendants Fu and Yeung are both quoted in the press release.

58.     These statements were false and misleading for the reasons stated in ¶ 50.

59.     In a conference call held on November 18, 2015 to discuss Cheetah's third quarter results for 2015, Defendant Fu stated:

So obviously Clean Master, CM Security they are some large applications and you know also have some very large contribution to revenues.

\*\*\*

So if you look at our CM Browser, Launcher they all have achieved critical mass

60.    In discussing the success of these apps and their contributions to revenue, Defendants failed to reveal that it earned revenue from these apps using an ad fraud technique known as click injection, which put it at risk of reputational harm and ejection from the Google Play store.

61.    On March 16, 2016 the Company issued a press release attached to a Form 6-K signed by Defendant Yeung, setting forth Cheetah's fourth quarter results for 2015. Defendants Fu and Yeung are both quoted in the press release.  The press release stated that, "Cheetah Mobile remained the third largest global publisher in Google Play's non-game category, with four of its mobile apps, namely Clean Master, CM Security, Photo Grid and CM Lockers, ranked among the top 40 most downloaded non-game apps on the Google Play App store in December."  In touting the success of these apps, Defendants failed to divulge its monetization strategy of taking credit for installs of new apps for which Cheetah played no role, aka click injection, to fraudulently obtain fees.

62.    On April 22, 2016, the Company filed its 2015 20-F, which contained signed certifications pursuant to SOX by Defendants Fu and Yeung, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

63.    The 2015 20-F is signed by Defendant Fu and lists Defendant Yeung as the Company's "contact person" on the cover page.  In the 2015 20-F, the Company reported total revenue of $568.7 million in 2015, approximately 88% of which it attributed to "online

marketing services."  In the 2015 20-F, the Company repeated the same statements contained in the 2014 20-F set forth in ¶¶ 49 and 51, which were false and misleading for the reasons stated in ¶ 50, 51 and 53.

64.     The Company acknowledged in the 2015 20-F that it "is subject to complex and evolving laws and regulations regarding privacy, [and] data protection[,] . . . which could result in claims, changes to [its] business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm [its] business" but did not reveal the ad fraud carried out through seven of its apps which violated these laws and regulations regarding privacy.

65.     Moreover, the 2015 20-F added CM Locker to its list of "Core Applications," which it described as follows: "CM Locker was launched in December 2014 on the Android platform. It is a lightweight lock screen with prompt notifications and maximum security. CM Locker enables users to access essential phone functions easily and quickly."

66.     Defendants' description of CM Locker was false and misleading for the same reasons stated in ¶¶ 53 and 54.

67.     On November 21, 2016, the Company held a conference call to discuss its third quarter of 2016 results. On that call, Defendant Fu stated, "Firstly, our utility app continued to provide solid revenue growth and steady and growing profitability. According to App Annie, Clean Master has remained number one in the US tool application category."  These statements were false and misleading for the reasons stated in ¶ 50.

68.     The Company issued a press release dated March 21, 2017, attached to a Form 6-K signed by Defendant Yeung, discussing Cheetah's fourth quarter of 2016 results. Defendants Fu and Yeung are both quoted in the press release.  The press release stated:

We are pleased that the steady and sustained revenue growth generated by our utility apps helped to continue to drive our revenue and profit growth sequentially in the second half of 2016.  As Cheetah's profit center, our mobile utility apps have continued to expand its profitability, which in turn supported our mobile content strategy. Product-wise, we remained the third largest publisher of non-game mobile applications in Google Play Worldwide in February 2017, according to App Annie.

69.     On the same day, the Company held a conference call to discuss its third quarter of 2016 results. On that call, Defendant Fu stated:

I mean, we also if you look at about that, if you look at our recent data or you look at the publicly available data, you have seen – you probably have seen that CM Launcher is a product that produced by us have become the #1 launch product globally, beating some of the more global competitors like Apple and others and that product growth was mainly organic without much or very little marketing activities to promote that application, mostly coming from users download the product themselves from the App Store..

70.     The statements in in ¶¶ 68-69 are false and misleading for the reasons stated in ¶¶ 50 and 53.

71.     On April 26, 2017, the Company filed its 2016 20-F, which contained signed certifications pursuant to SOX by Defendants Fu and Ng, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

72.     The 2016 20-F is signed by Defendant Fu and lists Defendant Ng as the Company's "contact person" on the cover page.  In the 2016 20-F, the Company reported total revenue of $657.5 million in 2016, approximately 86% of which it attributed to "online marketing services."  In the 2016 20-F, the Company repeated the same statements contained in the 2014 20-F and 2015 20-F as set forth in ¶¶ 49, 51, and 64, which were false and misleading for the reasons stated in ¶¶ 50, 51, 64.

73.     On a conference call held on August 22, 2017 to discuss Cheetah's second quarter results for 2017, Defendant Fu stated:

I will start with our utility products business. We have continuously enhanced our product features to strengthen our leading position in the global utility app market.

***

According to FNE, CM Launcher has ranked as the top personalized app in the U.S. on Google Play since this May. We're seeing higher market potential of the CM Launcher app in the long run, while continuously improving our utility products. We have also made great efforts in optimizing their cost and expense structure. As a result, we continued to generate robust operating profit and cash flow in our utility product business in Q2.

74.    On a conference call held on November 21, 2017 to discuss Cheetah's third quarter results for 2017, Defendant Fu stated:

Our utility products remain popular among users. Clean Master maintains the highest rating on Google Play. More than 100 million users access the app everyday and more than 30 million users have given it a 5-star rating.

CM Launcher remains a personalized app on Google Play in the U.S. and Security Master once again topped the largest test of Android security by AV-TEST. Revenues from our utility products and services remain stable in this quarter, thanks to our large global user base.

When asked about utility product profitability, Defendant Jiang responded:

First of all, the improving profitability comes from the optimization of our costs and expenses and also we optimize our product structure. Certain not so profitable products we have made some adjustments to that. And the second part is that we do have very good growth for our mobile utility products in the domestic market and that also contributes significantly to the profit growth.

75.    In discussing the success of and revenues from its utility product apps, Defendants failed to reveal that it generated revenue by using click injection to take credit for app installs for which Cheetah had no role, raising a risk of reputational harm and ejection from the Google Play store.

76.    In a press release dated March 19, 2018 attached to a Form 6-K signed by Defendant Jiang, the Company discussed Cheetah's fourth quarter results of 2017 and stated that, "Clean Master has been the Company's most significant mobile product."  The Company

23

further stated, "CM Launcher and Cheetah Keyboard were among the top 10 personalized apps in the U.S. on Google Play. Recently, we became one of the top 10 game publishers in the U.S. on both Google Play and the Apple App Store." In a conference call the same day, Defendant Fu emphasized the profits from Cheetah's utility products stating, for example, "our AI-powered Cheetah Keyboard has grown into a leading set of profit…" and "CM Launcher has continued its fast growth even though its app has been on the market for a while."   Fu did not reveal that the apps generated profit using click injection.

77.     These statements were false and misleading for the reasons stated in ¶¶ 50 and 53.

78.     On April 24, 2018, the Company filed its 2017 20-F, which contained signed certifications pursuant to SOX by Defendants Fu and Jiang, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

79.     The 2017 20-F is signed by Defendant Fu and lists Defendant Jiang as the Company's "contact person" on the cover.   In the 2017 20-F, the Company reported total revenue of $764.6 million in 2017, approximately 69% of which is attributable to "utility products and related services."[1]   Clean Master, CM File Manager, CM Launcher 3D, Security Master, Battery  Doctor, CM  Locker,  and Cheetah  Keyboard  are  all  considered  "utility products."  The Company describes its utility products and related services business in the 2017 20-F, stating in relevant part:

> Revenues from utility products and related services accounted for 91.8%, 84.8%, and 69.1% of our revenues in 2015, 2016 and 2017, respectively. Our portfolio of utility products has attracted a massive user base, which enabled us to provide

---

[1] Beginning in the 2017 20-F, the Company ceased disclosing its revenue for "online marketing services," replacing it with the income statement line item of "utility products and related services."

> mobile advertising services to advertisers worldwide, as well as refer user traffic
> and sell advertisements on our mobile and PC platforms. We charge fees for our
> online marketing services generally based on three general pricing models, which
> include cost over a time period, cost for performance basis and cost per
> impression basis. Cost for performance basis refers to, among others, cost per
> click, cost per installation, cost per activation and cost per sale that originate
> from our platform, while cost per impression refers to cost based on the number
> of impressions over a period.

The Company described factors impacting revenue similarly to the 2014, 2015, and 2016 20-Fs, as set forth in ¶ 49.  The Company also repeated the assertions set forth in ¶¶ 51 and 64 above which were misleading for the same reasons.

80.   The Company also reported in the 2017 20-F that "[i]n 2015, 2016 and 2017, [its] five largest customers in aggregate contributed approximately 57.7%, 47.9% and 44.7% of [its] revenues, respectively. Google became [the Company's] largest customer in 2017, and contributed 15.2% of [its] total revenues, compared to 6.3% in 2016."  In discussing the source of its revenues, Defendants did not reveal that Cheetah earned substantial revenue from an ad fraud technique called click injection which it accomplished through seven of its most popular apps.

81.   The Company also reported in the 2017 20-F that one of its newest apps, Cheetah Keyboard, which it included on its list of "Core Applications," "was launched in December 2016 on the Android platform and is an artificial intelligence-enabled application." In the 2017 20-F, the Company specifically touted that Cheetah Keyboard "was featured four times by Google Play on its global homepage in the second half of 2017."  Its description of the Cheetah Keyboard app was false and misleading for the reasons stated in ¶ 53.

82.   The Company issued a press release dated August 20, 2018 attached to a Form 6-K signed by Defendant Jiang in which Cheetah reported second quarter results for 2018.  In the press release, the Company stated, "In this quarter, revenues from mobile utility products in

the domestic market grew substantially, primarily driven by our Clean Master application."

Defendants Fu and Jiang are both quoted in the press release.

83.     In a conference call the same day, Defendant Fu stated, "Revenues from mobile utility products in the domestic market grew substantially in the quarter. This growth was achieved even in an unfavorable market environment."   In response to a question regarding growth drivers, Defendant Jiang responded:

> Since starting Q3, last year, we have seen significant growth in the domestic markets for the utility products because of two reasons. First reason is that the user engage level has been increasing because we have made quite a significant improvement in the products results. And we also see our users agreeing because of that effect also because of we are doing more marketing within China because we are paying more attention to the domestic market now. And also the reason for the growth in the domestic market is we are adding new advertisers basically well diversified our adviser base including the relatively new companies such as internet companies like the short video producers, the news portals, for example.

84.     These statements were false and misleading for the reasons stated in ¶¶ 50 and 53.

85.     The Company issued a press release on November 21, 2018 attached to a Form 6-K signed by Defendant Jiang discussing Cheetah's third quarter results for 2018.  Defendants Fu and Jiang are both quoted in the press release.  In that press release, and in a conference call that same day, Defendants reported that revenues from mobile utility products in the domestic market increased by 54% year-over-year and 18% quarter-over-quarter.  Defendant Fu stated on the conference call that, "Importantly, our utility products business continues to generate strong profit and cash flow, which provides solid foundation of our investments in new initiatives."

86.     As described, the statements referenced in ¶¶ 48-85 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance

policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Cheetah's apps had undisclosed imbedded features which tracked when users downloaded new apps; (ii) Cheetah used this data to inappropriately claim credit for having caused the downloads; (iii) the foregoing features, when discovered, would foreseeably subject the Company's apps to removal from the Google Play store; (iv) accordingly, Cheetah's Class Period revenues were in part the product of improper conduct and thus unsustainable; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

87.    On November 26, 2018, *BuzzFeed News* published an article reporting that certain Cheetah apps then available in the Google Play store were found to be exploiting user permissions as part of an ad fraud scheme. The *BuzzFeed News* article, based on Kochava's findings, stated that Cheetah's apps "tracked when users downloaded new apps and used this data to inappropriately claim credit for having caused the download."

88.    According to the article, which heavily cited Simmons, the scheme exploited the mechanism used by app developers to pay its partners to generate new downloads.  App developers often pay a fee that typically ranges from 50 cents to $3 to partners each time a user clicks on an ad for an app and then installs and opens it. Central to this payment structure is the accurate attribution of advertisers driving the installations.

89.    However, as the article reported, precise app installation attribution is difficult: "To attribute the installation to the correct party, information about the device used to click on the ad and the network and publisher that served it is passed along with the app installation.

When the app is finally opened, the app does a 'lookback' to see where the last click came from and attribute the installation accordingly."

90.     The *BuzzFeed News* article reported that Cheetah embedded a feature in certain of its apps to ensure that Cheetah was awarded the "last click" each time another app was download on the same device, regardless of whether Cheetah had any role in the download in question. The article further reported that Cheetah programmed its apps to launch the newly downloaded app without the user's knowledge following its download, which further increases the odds that Cheetah will receive credit for the app install, as the fee is only paid when a user opens a new app.

91.     The Cheetah apps exposed by the report include Clean Master (1 billion downloads), CM File Manager (65 million downloads), CM Launcher 3D (225 million downloads), Security Master (540 million downloads), Battery Doctor (200 million downloads), CM Locker (105 million downloads), and Cheetah Keyboard (105 million downloads). Several are among the most popular productivity apps in the entire Google Play store.

92.     Upon the publication of the article, certain of Cheetah's apps, including the Battery Doctor and CM Locker, were removed from the Google Play store.

93.     Following publication of the *BuzzFeed News* article, Cheetah's ADR price fell $3.32, or nearly 37%, over the next two trading sessions, closing at $5.48 on November 27, 2018.

94.     Simmons told Plaintiffs that after discovering Cheetah's nefarious activities, Kochava dropped Cheetah as a client (losing any revenue it would have received from keeping Cheetah as a client and not divulging the fraudulent conduct it had discovered to *Buzzfeed*).

95.     In a statement responding to the *Buzzfeed* article, Cheetah attempted to shift blame by claiming that third-party SDKs, integrated into its apps were responsible for the click injection.  However, as stated above, according to Kochava, the SDK involved in the suspect activity—adkmob—*is actually owned and developed by Cheetah*.    Moreover, Kochava explained that the explanation Cheetah provided refers to SDKs meant for ad delivery in-app. The fraud detailed in its research and in the *Buzzfeed* article does not look at in-app ad delivery from the apps in question, but instead the syndication of fraudulent signals taking place on the device when the apps are present.

96.     Cheetah has also tried to mitigate the devastating information brought to light in the *Buzzfeed* article by claiming fault with Kochava's testing methodology.   However, as *Buzzfeed* made clear, it hired Praneet Sharma, the Chief Technology Officer of ad fraud investigation firm Method Media Intelligence, to conduct an independent review, ***and Sharma came to the same conclusion as Kochava***.

97.     Then, on December 3, 2018 Google said that an internal investigation found that CM File Manager contains code used to execute ad fraud techniques known as click injection and/or click flooding and removed the app from the Google Play store.  At the time, app analytics company AppBrain reported that CM File Manager had been downloaded from the Google Play Store 50 million times.  A Google spokesperson said it continues to investigate the apps, and that it expects to take additional action.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

98.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Cheetah securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are

Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

99.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Cheetah securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Cheetah or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

100.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

101.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

102.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Cheetah;

- whether the Individual Defendants caused Cheetah to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Cheetah securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

103.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

104.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Cheetah securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Cheetah securities between the time the Defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

105.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

106.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

107.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

108.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

109.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and

32

maintain the market price of Cheetah securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Cheetah securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

110.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Cheetah securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Cheetah finances and business prospects.

111.    By virtue of their positions at Cheetah , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

112.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior

managers and/or directors of Cheetah, the Individual Defendants had knowledge of the details of Cheetah internal affairs.

113.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Cheetah.   As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Cheetah businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Cheetah securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Cheetah business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Cheetah securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

114.    During the Class Period, Cheetah securities were traded on an active and efficient market.   Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Cheetah securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or

acquisitions by Plaintiffs and the Class, the true value of Cheetah securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Cheetah securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

115.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

116.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

117.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

118.    During the Class Period, the Individual Defendants participated in the operation and management of Cheetah, and conducted and participated, directly and indirectly, in the conduct of Cheetah business affairs.  Because of their senior positions, they knew the adverse non-public information about Cheetah misstatement of income and expenses and false financial statements.

119.    As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Cheetah

financial condition and results of operations, and to correct promptly any public statements issued by Cheetah which had become materially false or misleading.

120.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Cheetah disseminated in the marketplace during the Class Period concerning Cheetah results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cheetah to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Cheetah within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cheetah securities.

121.    Each of the Individual Defendants, therefore, acted as a controlling person of Cheetah.  By reason of their senior management positions and/or being directors of Cheetah, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Cheetah to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Cheetah and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

122.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Cheetah.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  October 2, 2019                              Respectfully submitted,

**POMERANTZ LLP**

*/s/ Tamar A. Weinrib*
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: taweinrib@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Lead Counsel for Plaintiffs*

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email:  peretz@bgandg.com

*Additional Counsel for Plaintiffs*