```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
ADRIAN MARCU, et al.,                                                   :
                                                                        :
                                    Plaintiffs,                         :
                                                                        :     18-CV-11184 (JMF)
                 -v-                                                    :
                                                                        :     OPINION AND ORDER
CHEETAH MOBILE INC., et al.                                             :
                                                                        :
                                    Defendants.                         :
                                                                        :
------------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

Plaintiffs in this putative securities-fraud class action — brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 — are investors in Cheetah Mobile Inc. ("Cheetah Mobile"), a publicly traded Chinese computer application (or "app") developer. Plaintiffs allege that Cheetah Mobile and certain corporate officers (the "Individual Defendants" and, together with Cheetah Mobile, "Defendants") made various false and misleading statements in connection with an advertising fraud scheme known as "click injection." Cheetah Mobile and the Individual Defendants now move to dismiss the complaint. ECF Nos. 35, 51. For the reasons that follow, these motions are granted.

## BACKGROUND

The following facts, drawn from the Second Amended Complaint (the "Complaint"), ECF No. 56 ("SAC"), are assumed to be true for purposes of this motion. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010).

Cheetah Mobile is a developer of mobile apps, including both games and utility apps. *See* SAC ¶¶ 2-3. Cheetah Mobile's apps are available for download through various channels,

including Google Play, the official app store for Google's Android mobile operating system. *Id.* ¶ 31. The apps rank among the most popular apps on the Google Play store. *Id.* ¶ 2. Because many of Cheetah Mobile's apps are made free to users, the company generates revenue primarily through advertising. *Id.* ¶ 3. As relevant here, many of these advertisements are for other mobile apps. *See id.* ¶¶ 30, 40. When someone using an app clicks on an advertisement for another app, she is brought to the Google Play store. If she then downloads that app and opens it, the developer of the newly downloaded app makes a small payment — typically between fifty cents and three dollars, *id.* ¶ 88 — to the developer of the first app. *See id.* ¶ 40. The revenue created by Cheetah Mobile's free apps is derived in part from these referral bonuses, also known as "install bounties." *See id.* ¶ 36.

Plaintiffs allege that, through seven of its apps, Cheetah Mobile carried out a so-called "click injection" scheme to take credit — and payment — for app downloads in which it played no role whatsoever. *Id.* ¶ 4. A newly installed app determines which developer deserves a referral bonus when it is first opened by performing "a 'lookback' to see where the last click came from." *Id.* ¶ 89 According to Plaintiffs, certain Cheetah Mobile apps exploited this system by, first, "requir[ing] users to give [Cheetah Mobile apps] permission to see when new apps are downloaded, and to be able to launch other apps," *id.* ¶ 36; second, detecting new downloads and searching for available "active install bounties," *id.*; third, "inject[ing] fake clicks to make it appear a phone had clicked through an ad published by Cheetah," *id.* ¶ 42; and, fourth, "launch[ing] the newly downloaded app without the user's knowledge," *id.* ¶ 36. In the end, taking advantage of the fact that "precise app installation attribution is difficult," *id.* ¶ 89, Cheetah Mobile was able to make it seem as though its apps had referred its users to the newly downloaded apps even when they were downloaded "organic[ally]," *id.* ¶ 34.

This "click injection" scheme was first revealed on November 26, 2018, in a *BuzzFeed News* article, upon which Plaintiffs rely heavily. The *Buzzfeed* article cited analysis performed by Kochava, "a mobile app analytics company" that "determine[s] which ad network (such as Google, Facebook or Cheetah) should receive attribution . . . when a user downloads and opens an app." *Id.* ¶¶ 39-40. Kochava "wiped [a phone] clean" of its data, then "reset it and downloaded a Cheetah app." *Id.* ¶ 43. Kochava then opened the Cheetah app for a minute, closed it, and downloaded an app from Google Play. *Id.* Kochava found that the phone "communicat[ed] that the . . . user had clicked through an ad on a Cheetah network" to download the app, even though Kochava had not actually clicked on any advertisement in the Cheetah app. *Id.* All of this was recorded on video. *Id.* ¶ 44. Kochava "traced the nefarious activity" to a software development kit or "SDK" owned and authored by Cheetah Mobile. *Id.* ¶ 45. *Buzzfeed* also hired another expert "to conduct an independent review," and he "came to the same conclusion as Kochava." *Id.* ¶ 96 (emphasis omitted).

In a statement responding to the *Buzzfeed* article, Cheetah Mobile insisted that "third-party SDKs[] integrated into its apps were responsible for the click injection." *Id.* ¶ 95. According to Kochava, however, the SDK involved in the scheme was "actually owned and developed by" Cheetah Mobile. *Id.* (emphasis omitted). Regardless, "[u]pon the publication of the article, certain of Cheetah's apps . . . were removed from the Google Play Store." *Id.* ¶ 92. Moreover, after the article's publication, Google conducted its own investigation, and on December 3, 2018, it reported that one of the seven apps "contain[ed] code used to execute ad fraud techniques known as click injection." *Id.* ¶ 97. Google "removed the app from the Google Play store." *Id.* Because, as Cheetah Mobile itself recognized, Google Play was an "importan[t] . . . means of distribution for its apps," *id.* ¶ 51, the allegations in the article posed a significant

risk to Cheetah Mobile's business. Plaintiffs allege that, in response to the *Buzzfeed* article, Cheetah Mobile's American depositary receipt price "fell $3.32, or nearly 37%, over the next two trading sessions, closing at $5.48 on November 27, 2018." *Id.* ¶ 7.

Plaintiffs filed the present action on November 30, 2018, *see* ECF No. 1, alleging that, between April 21, 2015, and November 27, 2018, Defendants concealed the click injection scheme and made false or misleading statements, all in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Plaintiffs challenge a host of disclosures, which can be grouped into three general categories: (1) statements regarding Cheetah Mobile's revenue and its sources; (2) statements regarding the functionality and popularity of the utility apps at issue; and (3) statements regarding the importance of Google Play to Cheetah Mobile's business model. Defendants move to dismiss all of Plaintiffs' claims.

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012). The Court will not dismiss claims unless Plaintiffs have failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, Plaintiffs must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555.  If Plaintiffs have not "nudged their claims across the line from conceivable to plausible, [those claims] must be dismissed."  *Id.* at 570.

Because Plaintiffs in this case allege securities fraud, they must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted).  To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).  A plaintiff may do so by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*  For an inference of scienter to be "strong," a reasonable person must deem the inference "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

5

## DISCUSSION

As noted, Plaintiffs seek to hold Defendants liable for securities fraud under Sections 10(b) and 20(a) of the Exchange Act and Securities Exchange Commission Rule 10b-5.  To state a claim that Defendants made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5, Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted); *see IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).  Relatedly, to state a claim under Rule 20(a), Plaintiffs must, at a minimum, plead a plausible "primary violation" of Section 10(b).  *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *Total Equity Capital, LLC v. Flurry, Inc.*, No. 15-CV-4168 (JMF), 2016 WL 3093993, at *2 (S.D.N.Y. June 1, 2016).  Appling those standards here, the Court concludes that the Complaint must be dismissed for at least two reasons: because the challenged statements are not false or misleading and because Plaintiffs do not adequately plead scienter.

**A.  False or Misleading Statements or Omissions**

"[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  Generally, "disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."  *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (internal quotation marks, footnotes, and alterations omitted).  Instead, unless otherwise imposed by statute or regulation, a

duty to disclose misconduct arises only when necessary to ensure that a corporation's affirmative statements are not false or misleading.  *See, e.g.*, *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 586-87 (S.D.N.Y. 2006); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006).  Accordingly, plaintiffs who assert claims rooted in a failure to disclose misconduct — as Plaintiffs do here — must "ple[ad] with sufficient specificity," *Axis*, 456 F. Supp. 2d at 588, how "the alleged omissions . . . are sufficiently connected to Defendants' existing disclosures to make those public statements misleading," *Marsh & Mclennan*, 501 F. Supp. 2d at 469.

Plaintiffs fail to meet that standard.  Many of the allegedly misleading statements they identify simply describe a user's experience with Cheetah Mobile apps, the apps' popularity on Google Play, or similar topics plainly unrelated to a scheme to fraudulently garner referral bonuses from advertisers.  *See* SAC ¶ 52 (describing functions that three apps perform for their users); *id.* ¶ 54 (describing an app as "the #1 mobile app in the Google Play Tools category worldwide by monthly downloads"); *id.* ¶ 55 (describing apps' popularity); *id.* ¶ 61 (stating that "Cheetah Mobile remained the third largest global publisher in Google Play's non-game category"); *id.* ¶ 65 (describing an app as "a lightweight lock screen with prompt notifications and maximum security" that "enables users to access essential phone functions easily and quickly"); *id.* ¶ 67 ("According to App Annie, Clean Master has remained number one in the US tool application category."); *id.* ¶ 68 ("Product-wise, we remained the third largest publisher of non-game mobile applications in Google Play Worldwide . . . ."); *id.* ¶ 69 (describing an app as "the #1 launch product globally," and explaining that its growth was "organic without much or very little marketing activities to promote that application"); *see also ids.* ¶¶ 73, 76, 81.  Plaintiffs' conclusory assertion that such statements were misleading because "they did not

7

explain that they each used 'click injection' to claim credit for user installs of other apps," *id.* ¶ 53, is easily dismissed. The functions that the apps perform for users are unaffected by silent signals intended to capture referral bonuses. Similarly, reporting the number of app downloads or describing apps' popularity with users suggests nothing about how the apps generate revenue.

Nor do Plaintiffs plausibly allege that the challenged statements regarding revenue and profit derived from the apps are misleading. "[A] violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997)). Nor are statements actionable merely because they "put into words information reflected in the company's financial statements." *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016). That said, a statement may be misleading if it describes the factors that influence the reported figures but omits the fact that one such factor is the alleged misconduct. For example, in *In re VEON Ltd. Securities Litigation*, No. 15-CV-8672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017), the plaintiffs alleged securities fraud on the ground that the defendant had concealed that it had paid bribes to receive favorable treatment in Uzbekistan. Notably, the court held that "references to sales and subscriber numbers in Uzbekistan" were not, in themselves, misleading. *Id.* at *6. By contrast, assertions that growth in the Uzbekistani market was due to "the improving macroeconomic situation, product quality and efficient sales and marketing efforts" were misleading because the "growth also was due to bribe[ry]." *Id.*; *see also In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758-61 (S.D.N.Y. 2017) (holding that a list of reasons for the low price the defendant had paid for a good was plausibly misleading because it omitted a "key factor, the bribery-affected side deal" with the supplier and therefore amounted to "a classic half-truth"); *In re Sanofi*, 155 F. Supp. 3d

at 404 (holding descriptions of the growth of a product line were not misleading because none of the statements "offered any explanation as to why the products were selling more . . . [nor] attribute[ed] the sales growth to a particular factor that is implicated in the alleged fraud").[1]

Plaintiffs here allege that various revenue-related statements were misleading because Defendants "failed to reveal" that Cheetah Mobile had "earned revenue from these apps using an ad fraud technique known as click injection." SAC ¶ 60. But many of these statements "did nothing more than" accurately "characterize . . . statistical facts." *In re Sanofi*, 155 F. Supp. 3d at 404.[2] For example, the statement by one of the Individual Defendants that certain apps "have some very large contributions to revenues" or "have achieved critical mass," SAC ¶ 59, is not misleading in the slightest; indeed, Plaintiffs themselves more or less concede that the numbers characterized "were technically accurate." Opp'n 19. Similarly, a press release stating "that

---

[1]  *In re Van der Moolen Holding N.V. Securities Litigation*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005), upon which Plaintiffs rely, *see* ECF No. 63 ("Opp'n"), at 17, could be read to hold that a company engages in securities fraud if it issues an otherwise accurate statement of revenues but fails to disclose that some of the revenues are derived from fraudulent activity. The Court is not inclined to adopt that reading of *Van der Moolen* for the reasons ably stated by other judges in this District. *See, e.g.*, *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008); *Marsh & Mclennan*, 501 F. Supp. 2d at 470-71. To the extent it is an accurate reading of the decision, the Court declines to follow it, as doing so would be inconsistent with the well-established proposition that there is no "general duty to disclose corporate mismanagement or uncharged" misconduct, *In re Sanofi*, 155 F. Supp. 3d at 403, and would transform the securities-fraud laws into insurance against any wrongdoing.

[2]  Citing *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*, 595 F.3d 86, 89-93 (2d Cir. 2010), Plaintiffs contend that "[t]he Second Circuit has held that a company can be liable for not divulging that a portion of its reported numbers is due to misconduct, even where those numbers are technically accurate." Opp'n 18-19. But that citation is misleading at best. *Operating Local 649 Annuity Trust Fund* did not involve statements about revenue and did not even discuss falsity; it addressed the *materiality* of concededly misleading statements about fees (namely, "excessive, misleadingly disclosed fees, a significant portion of which were, in essence, kick[backs]"). 595 F.3d at 89; *see id.* at 91-95. And in any event, the case is easily distinguished from this one; there, unlike here, the statements at issue falsely characterized portions of the reported numbers. *See id.* at 94 ("[T]he expenses categorized as transfer agent fees were not transfer agent fees at all.").

revenues from mobile utility products in the domestic market increased" and "generate[d] strong profit and cash flow" merely describe undisputed data. SAC ¶ 85. Put simply, these disclosures did "not put the *source* of [Cheetah Mobile's] success at issue." *In re KBR, Inc. Sec. Litig.*, No. CV H-17-1375, 2018 WL 4208681, at *5 (S.D. Tex. Aug. 31, 2018) (emphasis added). That is, they did not "put the circumstances surrounding" the means by which Cheetah Mobile's apps generated revenue "'in play' — by, for instance, touting some legitimate competitive advantage or specifically denying wrongdoing — but instead merely report[ed] the facts that some of the reported revenue and income came from 'increased progress,' or 'increased activity' . . . and the like — reports that Plaintiffs do not contend were false." *Id.*

Plaintiffs come closer to the mark with respect to Defendants' disclosures explaining the drivers of revenues and profits from mobile apps, but here too they ultimately fall short. Specifically, Plaintiffs take issue with Cheetah Mobile's representations that it "generate[d] online marketing revenues primarily by referring user traffic and selling advertisements on our mobile and PC platforms." SAC ¶ 49 (emphasis omitted). Cheetah Mobile also articulated its "belie[f] that the most significant factors affecting revenues from online marketing include[d]," *inter alia*, "a large, loyal and engaged user base," which "results in more user impressions, clicks, sales or other actions that generate more fees for performance-based marketing," and "the fee rate [Cheetah Mobile] receive[d] per click or per sale." *Id.*; *see also id.* ¶¶ 63, 72, 79 (identifying other disclosures that "described factors impacting revenue similarly" to the disclosure in Paragraph 49). At first glance, these statements appear akin to those found actionable in *In re VEON Ltd.* Cheetah Mobile represented that its revenue was generated by referrals; Plaintiffs allege that the very same revenue was, in fact, generated in part by fraud. But there is a critical difference: The disclosures here did not, explicitly or implicitly, rule out other

10

factors playing a role in generating revenue. To the contrary, by using words such as "primarily" and "most significant," Defendants overtly acknowledged that other factors might play a role. To be sure, the statements did unmistakably imply that any unstated factors played a minor role relative to the stated factors. But Plaintiffs allege no facts suggesting, let alone showing, that implication to be false. In fact, the Complaint does not include a single allegation about the significance of the click injection scheme — which is alleged to have been linked to only seven apps — to Cheetah Mobile's overall revenues. In short, the Complaint includes no allegation supporting Plaintiffs' claim that the disclosures were "half-truths." *In re Braskem*, 246 F. Supp. 3d at 761.

Finally, Plaintiffs also fail to state a claim with respect to Cheetah Mobile's risk disclosures. *See* SAC ¶ 51 ("If Google Play . . . terminates their existing relationship with us, our business, financial condition and results of operations may be materially and adversely affected." (alterations and emphasis omitted)); *id.* ¶ 64 (disclosing that Cheetah Mobile is subject to complex and evolving regulations regarding data protection, which could adversely affect Cheetah Mobile's business). As an initial matter, it is not clear if Plaintiffs allege that these statements are themselves actionable or if they are merely arguing that they do not cure otherwise misleading statements. *See* Opp'n 21-22 (arguing that "Defendants' [r]isk [d]isclosures [m]isled [i]nvestors" by reasoning that "nonspecific warnings, when Defendants were aware of specific risks, do not excuse Defendants' misleading statements"). The Court's conclusion that the other statements were not false or misleading, however, obviously renders the latter possibility irrelevant. As for the former, "cautionary statements of potential risk have only rarely been found to be actionable by themselves." *In re FBR Inc.*, 544 F. Supp. 2d at 360-61. Those that have been found actionable typically "warn of a risk that has already occurred."

11

*Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 n.19 (S.D.N.Y. 2018); *see also In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018) (holding disclosures regarding the risk that a company "could be subjected to investigation" were "potentially misleading" because the company was already subject to an investigation (alterations omitted)).[3]

Here, at the time the statements were made, the possibility that Google Play might terminate its relationship with Cheetah Mobile had not yet materialized; instead, it remained — indeed, still remains — hypothetical. *See, e.g.*, *In re FBR Inc.*, 544 F. Supp. 2d at 362 (holding that a risk disclosure was not misleading in part because it "focused on the risk of loss from regulatory violations that had yet to transpire" — even though "the alleged noncompliance" itself "had occurred"). And no reasonable investor would have understood the challenged statements regarding regulatory risk to mean that Cheetah Mobile then faced no such risk. *Compare Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 245, 248-49 (E.D.N.Y. 1989) (holding that a statement touting a company's "additional, elaborate compliance and control steps" as "the best procedures in the industry" was actionable because it was intended to assuage investors' concerns regarding investigations and because fraud was endemic in the company's primary source of revenue), *with In re FBR Inc.*, 544 F. Supp. 2d at 362 (holding that "boilerplate description of [defendant's] regulatory risks could not have been misleading to a reasonable investor as the description said nothing company-specific, and no reasonable investor would infer anything about the state of the company's regulatory compliance" (internal alterations

---

[3] Once again, *Van der Moolen* could be read to endorse a broader proposition: that a defendant can be held liable based on little or nothing more than an allegedly inadequate warning of risk. *See In re FBR Inc.*, 544 F. Supp. 2d at 361. Once again, there is good reason to avoid — or decline to follow — that reading. *See id.* at 361-63; *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048-49 n.13 (N.D. Cal. 2007).

omitted)), *and Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *8 (S.D.N.Y. Jan. 18, 2018) ("[N]o reasonable investor would interpret such a generic risk warning as an assurance of present compliance.").

In sum, none of the disclosures challenged by Plaintiffs were rendered false or misleading by virtue of Defendants' failure to admit that they had engaged in the alleged click injection scheme. Accordingly, all of Plaintiffs claims must be and are dismissed. *See First Jersey Sec., Inc.*, 101 F.3d at 1472 ("In order to establish a prima facie case of controlling-person liability [under Section 20(a)], a plaintiff must show a primary violation.")

**B. Scienter**

In any event, Plaintiffs' claims must be dismissed for a second, independent reason: They do not adequately plead knowledge on the part of any Defendant. To satisfy the PSLRA's exacting pleading standards, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)). Section 10(b) and Rule 10b-5 require that the defendant must have intended "to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)) (internal quotation marks omitted). The Second Circuit has interpreted that language to require proof of either intent or recklessness. *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008). Securities-fraud claims based on recklessness, however, must "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

More specifically, a plaintiff can establish scienter for purposes of a securities-fraud claim by alleging facts showing "either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). To satisfy the "motive and opportunity" prong, a plaintiff must allege that a defendant "benefitted in some concrete and personal way from the purported fraud." *Id.* (quoting *Novak*, 216 F.3d at 307-08)). "[T]he desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.* Instead, to satisfy the "motive" prong, a plaintiff must generally show that "corporate insiders allegedly ma[de] a misrepresentation in order to sell their own shares at a profit." *Id.* If a plaintiff is unable to make that showing, she may resort to the "strong circumstantial evidence" prong." *Id.* at 198-99. If there is no evidence of motive, however, "the strength of the circumstantial allegations must be correspondingly greater." *Id.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). A plaintiff can make the necessary showing by pleading that "defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *Id.* (quoting *Novak*, 216 F.3d at 311).

Plaintiffs' allegations here fall short of these demanding requirements. For starters, they do not even attempt to satisfy the "motive and opportunity" prong. Instead, they rely exclusively on the "strong circumstantial evidence" prong. In particular, Plaintiffs argue that a strong inference of scienter flows from several allegations, taken together. First, Plaintiffs note that the Individual Defendants were Chief Financial Officer, Principal Financial Officer, Chief Executive

14

Officer, or a controlling shareholder when the statements were made. *See* Opp'n 26-27. Second, the challenged statements "demonstrated [the Individual Defendants'] knowledge of . . . each of the seven apps implicated in the click injection scandal as well as the Company's revenues from utility products generally." *Id.* at 26. Third, Cheetah Mobile owned the SDK involved in the click injection scheme. *Id.* at 27. Fourth, confidential witnesses stated that Cheetah Mobile "valued clicks and revenue above all else, including integrity." *Id.* at 28. Fifth, the utility apps implicated were core offerings and, "[f]ollowing the revelation of the fraud, Cheetah's revenues from its utility products . . . plummeted." *Id.* at 27-28. And sixth, Cheetah Mobile had been accused of advertising fraud before. *See id.* at 28. Even taken together and construed in the light most favorable to Plaintiffs, however, these facts do not establish that it is at least as likely that Defendants acted with scienter as that they did not. *See Tellabs*, 551 U.S. at 324.

First, it is well established that a defendant's position does not, without more, support a conclusion that the defendant had access to information contradicting an alleged misrepresentation. *See In re Sanofi*, 155 F. Supp. 3d at 406-07 (collecting cases). Second, Plaintiffs do not "specifically identify" any "reports or statements containing [contradictory] information." *Novak*, 216 F.3d at 309. They do not, for example, allege any report indicating that Cheetah Mobile derived substantially more referral revenue per user than other similar apps. And the additional facts actually alleged do not lead to a different conclusion. Plaintiffs' second allegation — that the Individual Defendants were aware of the apps' features and top-line revenue figures and that the apps generated revenue through referrals — does not suggest awareness that some revenue ostensibly derived from real referrals was in fact derived from false attribution. *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 817 (S.D.N.Y. 2018) ("Plaintiff . . . only alleges that Defendants knew about a *payment* related to the project, not that they knew

15

about an *unlawful* payment."); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 490 (S.D.N.Y. 2010) ("While general knowledge . . . could be attributed to [the defendant], the plaintiffs' claims rest on more nuanced, small-bore details."). Plaintiffs' third allegation is underwhelming for similar reasons. Plaintiffs do not explain why Cheetah Mobile's ownership of the SDK in question suggests that Defendants were aware that the SDK caused false attributions. Plaintiffs do not, for example, allege facts indicating that the Individual Defendants were intimately involved in the SDK, let alone its coding. The confidential witness statements are similarly unpersuasive, because they do not "show that individual defendants *actually possessed* the knowledge highlighting the falsity of public statements." *Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15-CV-7199 (JMF), 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017) (internal quotation marks omitted).[4]

Plaintiffs' fifth allegation, that utility apps were core offerings, effectively invokes the "core operations doctrine," which "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business, which include matters critical to the long term viability of the company and events affecting a significant source of income." *Hensley v. IEC Elecs. Corp.*, No. 13-CV-4507 (JMF), 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (internal quotation marks omitted). That, in turn, permits an inference that the company and senior executives knew or should have known if statements concerning such core operations were false or misleading. *See id.* But it is far from clear that the core operations doctrine remains valid in light of the PSLRA. *See, e.g.*, *Plumbers & Pipefitters*, 741 F. Supp. 2d at 490 ("Whether a plaintiff may rely on the core operations doctrine in light of the

---

[4] In fact, Plaintiffs themselves expressly state that they do not rely on the confidential witnesses "to establish scienter but rather to demonstrate that Cheetah [Mobile] prioritized clicks and revenue above all else and internally promoted quantity over quality." Opp'n 29 n.20.

16

PSLRA has not been decided by the Court of Appeals for the Second Circuit.  Those Courts of Appeals that have addressed the question have found that it is no longer viable in most situations." (citation omitted)).  At best, core-operations allegations are "supplementary" — they are not "independently sufficient means to plead scienter."  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).

That leaves the suggestion, which Plaintiffs make only fleetingly, that Defendants were likely aware of the click injection scheme because they had been accused of click fraud before.  *See* Opp'n 28 (citing *Masterson v. Cheetah Mobile Inc.*, No. 2:17-CV-8141-R, 2018 WL 5099505 (C.D. Cal. June 27, 2018)).  But the litigation Plaintiffs reference was not initiated until November 8, 2017, *see* No. 2:17-CV-8141-R, ECF No. 1 (C.D. Cal. Nov. 8, 2017), and the report that triggered it was not published until October 26, 2017, *see id.* ¶ 22 — *after* all but a few of the disclosures challenged here were made.  Moreover, the plaintiffs in *Masterson* made different allegations, did not identify the apps that were allegedly involved in fraudulent activity, *see generally* No. 2:17-CV-8141-R, ECF No. 26 (C.D. Cal. Feb. 15, 2018), and the case was later dismissed because its allegations of fraud were "mere[ly] conclusory," *Masterson*, 2018 WL 5099505, at *3 (internal quotation marks omitted).  It takes little more than a filing fee for a plaintiff to file suit against a company.  Thus, the mere fact that Cheetah Mobile had been sued — which is all that Plaintiffs allege — does not establish that Defendants knew or should have known about the click injection scheme at issue here.  *See Pirnik*, 2017 WL 3278928, at *3 (suggesting that a government report was insufficient to support scienter because it was "far from conclusive"); *cf. Plumbers & Steamfitters*, 694 F. Supp. 2d at 300-01 ("The securities laws do not require — and good business practice does not suggest — that financial institutions respond to every warble of the 24-hour news cycle.").

For these reasons, the Court concludes that Plaintiffs fail to sufficiently allege that the Individual Defendants acted with the requisite scienter. The Court reaches the same conclusion with respect to Cheetah Mobile itself. It is true that allegations of corporate scienter may be sufficient even when a plaintiff is unable to identify who, specifically, had knowledge of the matter concealed. *See, e.g.*, *Teamsters Local 445*, 531 F.3d at 195 ("[I]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."). But here, the Court "cannot say, based on the allegations in the complaint, that" the inference "that *someone* whose scienter is imputable to [Cheetah Mobile] and who was responsible for the statements made was at least reckless toward the alleged falsity of those statements" is "at least as compelling as the competing inference" that management was not privy to the click injection scheme. *Id.* at 197 (internal quotation marks omitted).

Accordingly, even if Plaintiffs plausibly allege that Defendants made a statement that was false or misleading — which they do not — Plaintiffs' claims against all Defendants would be subject to dismissal for failure to adequately allege scienter.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED, and Plaintiffs' Complaint is dismissed in its entirety.

The only remaining question is whether Plaintiffs should be granted leave to amend. Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and leave is often granted when the complaint is dismissed under Rule 9(b), *see ATSI Commc'ns*, 493 F.3d at 108, it is ultimately "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Here, Plaintiffs conspicuously do not request leave to amend, and the Court

declines to grant them leave to amend *sua sponte*. First, a district court may deny leave to amend where amendment would be futile. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). In light of the Court's reasoning regarding falsity, there is nothing to suggest that, if the Court were to grant leave to amend, Plaintiffs would be able to state a valid claim. *See, e.g.*, *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."). Second, Plaintiffs were previously granted leave to amend the complaint to cure the deficiencies raised in the present motions to dismiss — and expressly warned that they would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." ECF Nos. 38, 53. Plaintiffs availed themselves of that opportunity to amend, *see* ECF No. 56, and need not be given yet another opportunity, *see, e.g.*, *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) ("Plaintiff's failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend *sua sponte*." (citing cases)). Finally, as noted, Plaintiffs have not "requested permission to file a [Third] Amended Complaint" or "given any indication that [they are] in possession of facts that would cure the problems identified" above. *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014).

      The Clerk of Court is directed to terminate ECF Nos. 35 and 51 and to close the case.

      SO ORDERED.

Dated: July 16, 2020  
      New York, New York                                        JESSE M. FURMAN  
                                                                 United States District Judge